### In re KAY-TEE FILM EXCH.

(District Court, S. D. California, S. D.   August 21, 1911.)

#### No. 564.

BANKRUPTCY (§ 138*)—PERSONAL PROPERTY—RECLAMATION—LEASES.

Where petitioner, a manufacturer of moving picture films under a patent license, leased a quantity of films to the bankrupt, a film exchange which furnished films to moving picture shows, the title at all times remaining in petitioner, it was entitled to recover from the bankrupt's

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

trustee a quantity of films leased to the bankrupt more than four months before bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 138.*]

In the matter of bankruptcy proceedings of the Kay-Tee Film Exchange. On petition of the Lubin Manufacturing Company for the reclamation of 29 reels of films. On petition to review a referee's order granting relief prayed. Affirmed.

Following are the report, findings, and order of Referee Lynn Helm:

The petitioner, Lubin Manufacturing Company, has filed a petition herein for the reclamation of 29 reels of moving pictures. The matter is heard upon an agreed statement of facts as to the leasing of the moving pictures in question to the Kay-Tee Film Exchange, a corporation, bankrupt, and upon a statement of facts as to the patent situation as it is stipulated would be testified to by the secretary of the Motion Picture Patents Company. From these it appears that the petitioner, the Lubin Manufacturing Company, is a corporation of the state of Pennsylvania and has its principal office in Philadelphia, and the Kay-Tee Film Exchange is a corporation of the state of California in this district.

The Kay-Tee Film Exchange was adjudicated a bankrupt on the 27th day of September, 1910, and Charles H. McClure is the qualified and acting trustee of said bankrupt estate, and as such trustee is in possession of the motion pictures or reels described in the petition for reclamation.

The Motion Picture Patents Company is a corporation organized and existing under the laws of New Jersey and is the owner of certain letters patent of the United States granted for inventions relating to the manufacture of films for photographing objects in motion and to apparatus for taking motion picture photographs and for reproducing or exhibiting such pictures. Such pictures, when made for reproduction, are photographed or printed on transparent strips of film and are commonly designated as motion pictures or motion picture films or reels. The Motion Picture Patents Company does not manufacture, sell, or use such motion pictures, but has licensed others, including the petitioner, to manufacture such pictures and to lease, but not to sell, such motion pictures to licensed exchanges which have been licensed by the Motion Picture Patents Company to sublet such motion pictures to exhibitors or owners of motion picture shows, as in turn have been licensed by the Motion Picture Patents Company to exhibit the same. The Kay-Tee Film Exchange, bankrupt, was an exchange duly licensed by the Motion Picture Patents Company July 17, 1909, which license is filed in this proceeding; but such license was canceled in accordance with the license agreement July 19, 1910.

The motion picture films or reels mentioned in the petition for reclamation were manufactured by the petitioner in accordance with the terms of the license granted to the petitioner by the Motion Picture Patents Company and were delivered to the petitioner by the bankrupt upon terms and conditions of the license agreement of the Motion Picture Patents Company to the Kay-Tee Film Exchange, dated July 17, 1909, among which terms and conditions are these, namely:

(a) That the ownership of each licensed motion picture shall remain in the licensed manufacturer or importer from whom it may have been leased by the licensee, such license for any motion picture to terminate on the breach of such license agreement in regard thereto and the manufacturer or importer shall have the right to immediate possession thereof.

(b) That on the 1st day of every month, commencing seven months from the 1st day of the month on which the license agreement is executed, there shall be returned to the manufacturer an equivalent of motion picture film of the same manufacture, unless proof of destruction or loss is made.

(c) That whenever the agreement is terminated the right to possession of all the licensed motion pictures shall revert to the manufacturer 20 days after notice of such termination.

Each of the motion picture films or reels mentioned in the petition herein was sent to the bankrupt by the petitioner in a box or container, and each box or container had thereon, at the time of the shipment or delivery to the bankrupt, a label in words as follows:

"566 Licensed Motion Picture Manufactured, leased by and the property of Lubin Manufacturing Co., Pa., U. S. A. Patented in U. S., August 31, 1897; reissued Jan. 12, 1904. The inclosed motion picture is leased only and upon the following terms and conditions:

"(1) That the lessee shall not sell or otherwise dispose of the same outright, but shall have only the right to sublet or use such motion picture.

"(2) That the lessee shall permit such motion picture to be exhibited only on motion picture projecting machines licensed by the Motion Picture Patents Company of New Jersey, under its patents covering such projecting machines.

"(3) That the lessee shall not have the right to sublet such motion pictures until such lessee has entered into an agreement in writing with the Motion Picture Patents Company containing terms and conditions to be prescribed therein by it, and only while such lessee complies with all such terms and conditions and while such agreement remains in full force and effect.

"(4) That the lessee or user thereof shall not make or permit others to make any reproduction, commonly known as a 'dupe,' of such motion picture or any other motion picture containing the inventions of the above reissued patent.

"(5) That the lessee or user thereof shall not remove the trade-mark or trade-name or title therefrom.

"(6) That the violation of any of the foregoing conditions, including the terms and conditions of the agreement referred to in 3, entitles the lessor to immediate possession of this motion picture, without liability for any price which the lessee, or the person in whose possession it is found, may have paid therefor."

Accompanying the shipment was a bill for money to be paid on account of each of said motion picture films described in the petition on terms stated in the license of July 17, 1909, aforesaid, and upon each of said bills was the following printed notice, to wit: "The films covered by the invoice are leased and not sold; subject to the conditions of a license issued to lessee by the Motion Picture Patents Company of New York, and to the conditions expressed on the labels of the boxes in which these films are shipped." There is no other contract between the Lubin Manufacturing Company, the petitioner, and the Kay-Tee Film Exchange, bankrupt.

It appears from invoice, dated April 6, 1910, being the last shipment of motion pictures to the bankrupt, that more than seven months had expired since the last films were leased to the Kay-Tee Film Exchange by the Lubin Manufacturing Company before the commencement of this bankruptcy proceeding, and the petitioner has filed a claim herein for $470.03 balance due the petitioner from bankrupt at the date of the bankruptcy, June 6, 1910, on account of films furnished pursuant to the terms of the contract.

There is filed in the case a copy of the license agreement from the Motion Picture Patents Company to the petitioner, the Lubin Manufacturing Company, from which it appears that the Motion Picture Patents Company is the owner of certain letters patent of the United States in reference to improvements in the motion picture art, and as licensor gave a certain license to the Lubin Manufacturing Company, the petitioner herein, engaged in the manufacture and sale of motion pictures as licensee to manufacture and use certain of said inventions in connection with manufacturing, printing and producing the motion pictures. The license is a complete agreement between the licensor and the licensee in reference to manufacturing and leasing and use of said motion pictures and the conditions upon which they shall be used and employed by exchanges licensed by the Motion Picture Patents Company, and that in all cases the motion pictures are to be leased only to the exchanges and should not be sold or otherwise disposed of, but only sublet or used subject to said license agreement. The rates fixed for the use, which the licensee admits are fair and reasonable so far as this case is concerned, known as standing orders, were at the rate of 11 cents

per running foot, and this price was to be paid by the exchange, and in addition thereto the exchange was to return to the licensee from whom such motion picture had been leased an amount of positive motion picture film and of the make of the licensee to whom it is returned equal to the amount that was sold the exchange during the seventh month preceding the date of each such return unless destroyed by fire or lost in transportation.

It appears from the statement as to the patent situation that Thomas A. Edison was the patentee under United States patent No. 589,168, relating to the taking of motion pictures on film and camera for the production of motion pictures. This patent was reissued to Thomas A. Edison in two divisions, namely, No. 12,037 for the camera to take motion pictures, and No. 12,192 for the motion picture film made by such camera. These two patents are the dominating patents for the production of motion pictures. In addition to these patents, there are some 13 or 14 other patents for cameras, details of cameras, and projecting machines, all essential to the business of motion pictures. The projecting machine is an apparatus of the magic lantern type, by means of which the positive pictures are thrown upon a screen. The Edison Company did not possess any such patents and could not use the motion pictures made under its patents without projecting machines made under the patents belonging to others. There were many infringements of the Edison patents, and finally the Edison Company executed licenses to all of said infringing manufacturers, except the American Mutoscope & Biograph Company, granting to the licensees permission to make and use cameras embodying the invention of the patent, and also make, use, and sell motion pictures embodying the inventions for the production of motion picture films, upon a certain royalty to be paid to the Edison Manufacturing Company.

The American Mutoscope & Biograph Company at that time owned or controlled numerous patents dominating the whole art of motion picture projecting machines in which the motion pictures made by the licensees of the Edison Manufacturing Company were necessarily used in exhibition. That company also owned certain United States letters patent on the invention of Woodville Latham, No. 707,934, the inventions of which were in infringing use in the cameras operated by the Edison Company and licensees under the Edison patent. Suit had been brought for the infringement of the Latham patent, and to avoid an injunction, the granting of which would be the practical tying up of the whole trade and the stopping of all business, the Motion Picture Patents Company was formed, and all the patents of the Edison Manufacturing Company and the American Mutoscope & Biograph Company and others who were not manufacturers of motion pictures were assigned to the Motion Picture Patents Company, and the licenses under all of the patents were granted to the manufacturers, thereby relieving them from any question of infringement, and permitting them to use freely all of the patents dominating in the art.

Two kinds of licenses were granted to manufacturers by the Motion Picture Patents Company: (1) To the manufacturers of motion pictures a license under the camera patent and the reissue film patent No. 12,192, and the Latham patent; and (2) to manufacturers of motion picture projecting machines, a license under all of the projecting machine patents. The license of the second kind provided that projecting machines made and sold by the licensees should be restricted in their use in motion pictures made under the license of the Motion Picture Patents Company under the said reissue letters patent No. 12,192 and No. 12,037, and in turn under license of the first kind are required to market their films under the restrictions that they shall be used on the projecting machines manufactured under the license of the Motion Picture Patents Company under the projecting machine patents owned by it.

The Edison Manufacturing Company, possessed of the patent on the film and the camera for taking the film, agreed with certain companies who possessed patents on projecting machines and details of the camera, as well as the Latham patent, to assign their patents to the Motion Picture Patents Company and receive licenses from it under all the patents, thereby allowing the Edison Company to have a license under the Latham patent and

also to have a market for the film which would be made according to its patents, and to use it on projecting machines made under the patents of the other companies, and allowing the other companies to get moving picture films and use them on their projecting machines without hindrance from the owners of the patent on the films and camera, all under said licenses granted, or to be granted by the Motion Picture Patents Company. The Edison Company and the companies that entered into this arrangement as manufacturers of cameras, projecting machines, and motion pictures, were not manufacturers of raw or unfinished film which was necessary for use in the camera and upon which moving pictures were taken. The Eastman Kodak Company owned the patent on the raw or unfinished film known as the Penniman patent. An agreement was made between the Motion Picture Patents Company and the Eastman Kodak Company for the supplying of films to the licensees of the Motion Picture Patents Company upon the payment of a royalty to the Eastman Kodak Company, and the Eastman Kodak Company agreed not to supply films of standard size, except to the licensees of the Motion Picture Patents Company. The Eastman Kodak Company, however, was at liberty to supply films of different sizes for the same purpose, and also films of the same sizes for other purposes to parties not licensees of the Motion Picture Patents Company, and was free to sell to any one in the United States not engaged in the manufacture of motion pictures, or to sell to parties manufacturing in the United States motion pictures of less than one inch in width, or to make or sell films of any width for any purpose to persons manufacturing in foreign countries or to sell its films for export. The parties to this agreement and the various license agreements thereunder provide that the manufacturers may charge any sum above a minimum to all applying for the pictures made by them, and they can make them in any manner and quantity they wish and are able. They can use any patent or combination of patents in making the projecting machines, and they can charge any price they wish and can get for such machines from licensed exhibitors of the Motion Picture Patents Company.

The only restrictions, aside from what is hereinbefore stated, are that they must pay royalties for the use of the patents, and they must use the machines which are patented only for the use with the pictures which are patented, and that, if they use the raw films manufactured by the Eastman Kodak Company, must pay to the Eastman Kodak Company the royalties due that company for the use of its patents and the royalties due the Motion Picture Patents Company for the use of its patents.

It is contended by the petitioner that the conditions or terms of the only agreement or contract between the petitioner and bankrupt in the premises are contained in the license agreement of July 17, 1909, and the labels on the containers and invoice bills hereinbefore mentioned. On the other hand, the trustee in bankruptcy herein contends that the writing of July 17, 1909, between the Motion Picture Patents Company and the bankrupt and the license agreement between the Lubin Manufacturing Company, petitioner, and the Motion Picture Patents Company, constitute the purported agreement between the Lubin Manufacturing Company and the Kay-Tee Film Exchange.

It is in evidence that the price charged for the films or reels sought to be reclaimed are all or more than said reels and films are worth on the market, without regard to the agreement that they shall be returned to the manufacturer. From the view I take of this matter, it is not necessary to make a finding in reference thereto.

It appears to be agreed by the counsel for the petitioner, as well as the counsel for the trustee, that a reclamation proceeding, such as this is, is in the nature of an action of replevin, and that the rules for determining this proceeding are such as would be applicable if the action were in replevin.

(1) This brings us to the questions presented by the trustee as regard the validity of the contracts or exchange license agreement between the Motion Picture Patents Company and the Kay-Tee Film Exchange, and the agreement between the Lubin Manufacturing Company and the Motion Picture Patents Company above referred to with regard to the act of Congress on

the subject of trusts (Act of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and, when speaking of the contracts above referred to, I mean all the contracts in evidence between the parties to this proceeding, either the petitioner, or the bankrupt, and the Motion Picture Patents Company, and the agreements referred to in the foregoing statements as to the patent situation by which the Motion Picture Patents Company acquired the patents for the manufacture and exhibition of motion pictures. It is to be conceded that any one sued on a contract may set up as a defense that it is in violation of the act of Congress above mentioned, and, if found to be so, that fact will constitute a good defense to the action. Any individual, when sued upon a contract which is void when in violation of the anti-trust act above referred to, is permitted to set it up as a defense, and when proved it is a valid defense to any claim made under a contract therein denounced as illegal.

We must therefore consider the terms of these license contracts for the purpose of determining whether they violate the act of Congress. The most noticeable fact in considering this question is that the agreements above referred to concern articles protected by letters patent of the government of the United States. The Motion Picture Patents Company was, at the time these licenses were executed at the time of the bankruptcy herein, the absolute owner or in control of the letters patent relating to motion pictures and motion picture projecting machines.

If one were not already convinced that the Motion Picture Patents Company was the owner of a monopoly recognized by the Constitution and by the statutes of Congress, no other authority need be cited than Bement v. National Harrow Company, 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. This case was brought to the Supreme Court of the United States from the Court of Appeals of the state of New York, to settle a federal question which was involved in a suit which the National Harrow Company had brought against Bement to recover damages for alleged violation of certain contracts between the parties in relation to the manufacture and sale of certain harrows under a considerable number of patents owned or controlled by the National Harrow Company. That federal question was whether those contracts were void because violative of the Sherman law. The Supreme Court decided that, if those contracts were violative of the Sherman law, that fact would constitute a good defense to the action, but that court also decided that those contracts were not violative of the Sherman law, because that statute does not refer to that kind of restraint of interstate commerce which may result from contracts between patentees limiting the terms upon which the articles covered by the patents may be sold and regulating the price to be received therefor. On that point, Mr. Justice Peckham in delivering the opinion of the court said: "An owner of a patent has the right to sell or to keep it: to manufacture the article or to license others to manufacture it: to sell such article himself or to authorize others to sell it"—citing Wilson v. Rousseau, 4 How. 646, 674, 11 L. Ed. 1141; Grant v. Raymond, 6 Pet. 218, 241, 8 L. Ed. 376; Heaton-Peninsular Co. v. Eureka Specialty Co., 47 U. S. App. 146, 160, 77 Fed. 288, 25 C. C. A. 267. He further says: "The general rule is absolute freedom in the use or sale of rights under patent laws of the United States. The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the articles, will be upheld by the courts. The facts that the conditions in the contracts keep up the monopoly or fixed prices does not render them illegal. * * * As these contracts do, therefore, include interstate commerce within their provisions, we are brought back to the question whether the agreement between these parties with relation to these patented articles is valid within the act of Congress. It is true that it has been held by this court that the act included any restraint of commerce, whether reasonable or unreasonable. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addystone Pipe, etc., Company v. United States, 175 U. S.

211, 20 Sup. Ct. 96, 44 L. Ed. 136. But that statute clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the articles may be used and the price to be demanded therefor. Such a construction of the act we have no doubt was never contemplated by its framers."

I do not find in these licenses any conditions contained therein rendering the agreements void because of any violation of the Sherman anti-trust act, and no special provision is called to my attention other than the general provisions of the licenses which protect the patented monopoly. The prices particularly stated for the use of the reels, the licensees are not at liberty to contest. It was an appropriate and reasonable condition, and tended to keep up the price of the patented articles, and providing for their value so far as possible; this the parties were legally entitled to do when they entered into the agreements. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may license upon such terms and conditions and price for the use thereof as he may see fit.

In the absence of positive prohibiting legislation that licensees and owners of patents may not lease patented machines, by prohibiting the licensees or lessees from obtaining from any other person some machines or device to perform the same functions as those performed by the leased machine or device during the term of the lease, or prohibiting a lessee from using any other machine designed to perform the same functions, there is nothing in Re Opinion of Justices, 193 Mass. 605, 81 N. E. 142, in conflict with this opinion.

There is quite a distinction between the case at bar and also the case of Bement v. National Harrow Co., supra, and the case of Blount Manufacturing Co. v. Yale & Towne (C. C.) 166 Fed. 555. In the Bement Case the National Harrow Company was the absolute owner of all the letters patent covered by the contract which was involved in that case; and therefore that contract did not create any restraint of trade or any monopoly beyond the monopoly which the National Harrow Company already had under the patent law. In the case at bar, as in the Bement Case the Motion Picture Patents Company was, at the time the license was given to the bankrupt, the absolute owner or in control of all the letters patent covered by the contract which is here involved, and there is no more restraint of trade or monopoly in the license herein given beyond the monopoly which the Motion Picture Patents Company already had under the patent law. But in the Blount Case some of the patents involved in the contract were the property of the complainant, and some of them were the property of the defendant, and the contract operated to restrain the competition between the parties in regard to their respective patented inventions; and, inasmuch as that competition included interstate commerce, the contract operated, therefore, to restrain such commerce. In the Bement Case and in this case there was no competition between the patents before the contract was made, and therefore the contract did not restrain any competition; but in the Blount Case, before the contract was made, there was competition between the patents owned by the plaintiff and those owned by the defendant, and that competition was ended by the contract, which ending made the contract violative of the Sherman law.

I therefore find, and the agreements entered into and the statement of the patent situation show me, that there was a purpose and combination on the part of all owners of inventions relating to motion pictures and motion picture projecting machines, or reels or films, to control their manufacture, sale, and price in all portions of the United States, but that such combination and the contracts made in reference thereto are legally valid and binding contracts such as might be reasonably made under the circumstances founded upon an adequate consideration, and that they embody no illegal restraints and are not repugnant to any rule of public policy as to restraint of trade or tending to create a monopoly, trust, or any other illegal combination.

(2) Even if these contracts were void as against public policy and in restraint of trade, and that therefore a court would not lend its aid to either party to such unlawful agreement, the agreements were so far executed that the petitioner herein had delivered to the bankrupt and given it possession of the petitioner's property, and the lease of the moving pictures, or reels, to the bankrupt by the petitioner, was an independent contract, and the defense sought to be interposed by the trustee herein, that the petitioner and the bankrupt are members of an illegal combination, cannot be sustained. The bankrupt was in no wise concerned in the formation or operation of the Motion Picture Patents Company, and did not share in its profits, and was not liable to it. Such possession as the bankrupt thereafter held of the reels was as lessee of that property, and the title was not in the bankrupt in its own right as owner, but simply as the lessee of the petitioner. The right to reclaim these goods is not brought upon the contract, but upon a collateral matter for the recovery of the petitioner's own property. Even if one dealt with the principal of an illegal combination, if the action is not brought by the plaintiff to enforce the terms of the contract, but only for the purpose of recovering property which is his own, though coming into the hands of the defendant by reason of the terms of such contract, it is no defense that the original contract was illegal. In this case, the petitioner is prevented by the terms of the agreement from buying motion pictures or motion picture projecting machines or appliances, but the ownership of each licensed motion picture leased remains in the licensed manufacturer from whom it has been leased and shall not be sold by the exchange, and there shall be returned by the exchange to each licensed manufacturer without receiving any payment therefor on the 1st day of every month commencing seven months from the 1st day of the month on which said agreement is executed, an equivalent amount of positive motion picture film in running feet (not purchased or leased over 12 months before) and of the make of the said licensed manufacturer equal to the amount of licensed motion pictures that was so leased during the seventh month preceding the day of such return, unless destroyed or lost in transportation. Thereafter the bankrupt was in possession of the property by virtue of the license; it held the property as lessee, and was not permitted to do anything to infringe its lessor's title.

In the case of Gilbert v. American Surety Co., 121 Fed. 499, 503, 57 C. C. A. 619, 623 (61 L. R. A. 253), in a suit upon a replevin bond where the obligors in the bond may plead, in mitigation of damages, title to the property in dispute in the replevin suit, when the merits have not been determined in that suit, and the question was raised as to whether the contract between the American Preservers' Company and Andrew D. Bishop, the defendant in the replevin suit, was in restraint of trade and being in pursuance of an illegal trust agreement, and therefore that Bishop, who had sold his plant and received the stipulated consideration and for nearly three years thereafter had been in the service of the vendee at a stipulated salary, could defeat his vendee's title, and hold as his own the plant sold by him of which he was in possession only as agent of his vendee, and including goods subsequently purchased by the vendee, because the agreement under which the sale was executed was in restraint of trade, the court said: "We are not asked to enforce an agreement in restraint of trade. We are asked to declare that a trustee receiving property from his principal and holding it in trust for the principal shall not be permitted to gather it to himself. He is estopped to deny the title of his principal. There is no public policy which would warrant us to hold otherwise"—citing Manchester Railroad Company v. Concord Railroad Co., 66 N. H. 100, 20 Atl. 383, 9 L. R. A. 689, 49 Am. St. Rep. 582.

In the case of Armstrong v. American Exchange Bank, 133 U. S. 433, 10 Sup. Ct. 450, 33 L. Ed. 747, the court said: "An obligation will be enforced, though indirectly connected with an illegal transaction, if it is supported by an independent consideration so that the plaintiff does not require the aid of the illegal transaction to make out his case.

It is not proper for this court to allow the trustee to withhold property belonging to the claimant and which it would be entitled to recover against

the bankrupt, even if the withholding would be for the benefit of bankrunt's creditors.

There is a clear distinction between this position and the decision made in Continental Wall Paper Co. v. Voight & Sons Co., 148 Fed. 939, 78 C. C. A. 567, 19 L. R. A. (N. S.) 143; Id., 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486. This was an action at law in the Circuit Court of the United States for the Southern District of Ohio to recover $57,762, claimed to be due for wall paper which had been sold and delivered by the plaintiff to the defendant and had not been paid for. The defendant defended by stating in its answer that the plaintiff was a member of an illegal combination among wall paper manufacturers contrary to the Sherman law, and that the defendant had i, en compelled to become a party to that combination, and that the contract of sale upon which the suit was based was one of the agreements which constituted the illegal combination. Upon demurrer to this defense, the judgment was rendered for the defendant dismissing the case. The facts in this case were essentially as follows:

On July 1, 1898, the National Wall Paper Company was the owner of factories for the manufacture of wall paper, which factories were located in certain cities in New York, New Jersey, Pennsylvania, and Massachusetts, and at that time there were certain other wall paper factories owned by other persons and corporations in other states. All of said parties were engaged in manufacturing upward of 98 per cent. of all the wall paper manufactured and sold in the United States, and they were engaged in selling that wall paper partly in the states where it was manufactured, respectively, but also in all the other states and territories and in some foreign nations. Thereupon the Continental Wall Paper Company was organized to be the sole selling instrumentality of the National Wall Paper Company and of all the other above-mentioned manufacturers of wall paper, each of which made a separate contract with the Continental Wall Paper Company in substantially identical language. That contract provided that the particular manufacturer of wall paper executing it was to purchase and pay for some shares of the common stock of the Continental Wall Paper Company and was to sell to that company its entire product of wall paper, and that the wall paper thus acquired by the Continental Wall Paper Company was to be sold to jobbers for the account of that company at particular specified prices with particular discounts.

It was contended in the Continental Wall Paper Case that the contract upon which the action was brought was entirely collateral to the contract between the plaintiff and the other members of the illegal combination, and was therefore not vitiated thereby. It was held, however, that the contract to pay for the wall paper sold to the defendant was a part of the entire Continental Wall Paper scheme, and, as that scheme included illegal stipulations, the court would not enforce any part of the scheme. But in this case now before this court, the contract affects a mere incident in the manufacture and use of all motion pictures and motion picture projecting machines, and the proceeding to recover the films or reels of the licensees of the Motion Picture Patents Company by one of the licensed manufacturers is but a collateral matter incident to the licensing of both petitioner and the bankrupt to the use of motion pictures or motion picture projecting machines, or other appliances in connection therewith and covered by the letters patent owned or controlled by the Motion Picture Patents Company.

(3) I cannot agree with counsel for the bankrupt that the provisions of the contract of July 17, 1909, between the Motion Picture Patents Company and the Kay-Tee Film Exchange, the bankrupt, are irreconcilably inconsistent with the claim of reservations of title by the petitioner of the reels in question. It is true that under the said exchange license agreement all that the Kay-Tee Film Exchange had to do, in order to satisfy the claims against it of the petitioner, was to pay to the petitioner the price per running foot for such reels as were furnished to it by the petitioner and return to the petitioner without receiving any payment therefor on the 1st day of every month commencing seven months from the 1st day of the month on which said agreement is executed, an equivalent amount of posi-

tive motion picture film in running feet (not purchased or leased over twelve months before), and of the make of the said licensed manufacturer or importer, equal to the amount of licensed motion pictures that was so leased during the seventh month preceding the day of each such return, with the exception of motion pictures destroyed or lost in transportation. It was quite possible for the Kay-Tee Film Exchange to have procured other films manufactured by the petitioner and have returned the same to the petitioner, and, when the Kay-Tee Film Exchange had paid the amount of money provided for in the exchange license agreement and delivered the amount of film therein provided to be delivered, it would have satisfied every claim of the petitioner herein.

But this is not a claim against the trustee to enforce a specific performance of the contract and to require the trustee to secure an equivalent number of films per running foot from some other licensee of the manufacturer; it is a proceeding to recover from the trustee the exact films which were furnished by the manufacturer to the exchange and which films are the property, just as they are, of the manufacturing petitioner herein. If the films had been disposed of by the bankrupt, the trustee could not have been compelled to secure other films in order to return an equivalent or like amount to the manufacturing petitioner; but this is a proceeding to recover that which has come into the possession of the trustee and which actually belonged to the petitioner. It does not matter, therefore, if the bankrupt should have continued in business and had the right and been capable of satisfying the contract in another manner. So far as this proceeding is concerned, it is one to recover the identical property belonging to the petitioner and traced into the hands of the trustee in bankruptcy. The petitioner never intended to sell, and had no right to sell, and did not sell, said moving pictures or reels to the bankrupt.

For the foregoing reasons, the objections of the trustee to an order upon the trustee to deliver to the petitioner the films mentioned in the petition herein will be overruled.

Like petitions were also filed by the following petitioners, namely, Kalem Company, George Kleine, Vitagraph Company of America, Essanay Company, Edison Manufacturing Company, Selig Polyscope Company, Pathe Freres, Biograph Company, for the reclamation of reels, the property of said petitioners, respectively, as mentioned and described in their several petitions, and answers were filed by the trustee, and objections made by him to the delivery of said reels to said petitioners. The same state of facts is applicable to each of said petitions, and it is stipulated that a like order as made in the case of Lubin Manufacturing Company, whatever that order should be, shall be made upon the petitions of the other petitioners last above named; and it is so ordered.

Findings and Judgment on Petition of the Lubin Manufacturing Company for Reclamation of 29 Reels of Moving Pictures.

The Lubin Manufacturing Company having heretofore filed a petition for the reclamation of 29 reels of moving pictures in the possession of Charles H. McClure, trustee of the estate of the said bankrupt, on the ground that it is the owner of and entitled to the possession of said moving pictures, and said petition coming on regularly for hearing, Mr. T. F. McDonald appearing for said petitioner, and Hanson-Hackler & Heath appearing for said trustee; and evidence both oral and written having been introduced by the respective parties; and the court having been fully advised in the premises: The court finds the facts herein, as follows:

(1) The petitioner, the Lubin Manufacturing Company, is a corporation of the state of Pennsylvania, having its principal office in Philadelphia, Pa., and the Kay-Tee Film Exchange is a corporation of the state of California, having its principal office at Los Angeles, in said district.

(2) The Kay-Tee Film Exchange was adjudicated a bankrupt on the 27th day of September, 1910, and Charles H. McClure is the qualified and acting trustee of said bankrupt estate, and, as such trustee, is in possession of the motion pictures or reels described in the petition for reclamation.

(3) The Motion Picture Patents Company is a corporation organized and

existing under the laws, of New Jersey, and is the owner of certain letters patent of the United States, granted for inventions relating to the manufacture of films for photographing objects in motion and to apparatus for taking motion picture photographs and for reproducing or exhibiting such pictures; that such pictures, when made for reproduction, are printed on transparent strips of film, and are commonly designated as motion pictures, or motion picture reels; that said Motion Picture Patents Company does not manufacture, sell, or use such motion pictures, but has licensed others, including the petitioner, to manufacture such pictures, and to lease, but not sell, such motion pictures to licensed exchanges, which have been licensed by the Motion Picture Patents Company to sublet such motion pictures to exhibitors, or owners of motion picture shows, as in turn have been licensed by the Motion Picture Patents Company to exhibit the same; that the Kay-Tee Film Exchange, bankrupt, was an exchange duly licensed by the Motion Picture Patents Company, July 17, 1909, which license was canceled July 19, 1910, in accordance with the license agreement; that the motion picture films or reels mentioned in the petition for reclamation were manufactured by the petitioner in accordance with the terms of the License granted to the petitioner by the Motion Picture Patents Company, and were delivered by the petitioner to the bankrupt, upon the terms and conditions of the license agreement of the Motion Picture Patents Company and the Kay-Tee Film Exchange, dated July 17, 1909; that under the terms of said exchange license agreement, all motion pictures obtained from the petitioner herein, by said exchange, were leased, and the said exchange is required to return all such motion pictures to the respective manufacturers, as specified in the conditions of said exchange license agreement; that there is no other contract between the Lubin Manufacturing Company, the petitioner, and the Kay-Tee Film Exchange, bankrupt.

(4) That the invoice of the last shipment of motion pictures by the petitioner to the bankrupt was dated April 6, 1910, and that more than seven months expired since the last films were leased to the bankrupt by the petitioner, before the commencement of this bankruptcy proceeding; and that the petitioner has filed a claim herein for $470.03, balance due the petitioner from bankrupt, at the date of bankruptcy, June 6, 1910, on account of films furnished pursuant to the terms of the contract.

(5) The Motion Picture Patents Company, the owner of certain letters patent of the United States, in reference to improvements in the motion picture art, and as licensor, licensed the Lubin Manufacturing Company, the petitioner herein, engaged in the manufacture and sale of motion pictures, as licensee, to manufacture and use certain of said inventions in connection with manufacturing, printing, and producing the motion pictures. The license is a complete agreement between the licensor and licensee, in reference to manufacturing and leasing and using of said motion pictures, and the conditions upon which they shall be used and employed by exchanges, licensed by the Motion Picture Patents Company, and that in all cases the motion pictures are to be leased only to the exchanges, and should not be sold or otherwise disposed of, but only sublet or used subject to said license agreement. The rates fixed for the use are fair and reasonable, so far as this case is concerned.

(6) That the agreements entered into and the statement of the patent situation show that there was a purpose and combination on the part of all owners of inventions relating to motion pictures and motion picture projecting machines, or reels of films, to control their manufacture, sale, and price in all portions of the United States, but that such combination and the contracts made in reference thereto are legally valid and binding contracts such as might be reasonably made under the circumstances founded upon an adequate consideration, and that they embody no illegal restraints and are not repugnant to any rule of public policy as to restraint of trade or tending to create a monopoly, trust, or any other illegal combination.

(7) The facts found by this court relating to the license agreement between the Motion Picture Patents Company and the Kay-Tee Film Exchange, the manner in which the motion pictures were leased and shipped by the petitioner to the bankrupt, together with the patent situation, are more

fully stated by the court in its opinion filed herein, on the 28th day of February, 1911.

(8) That the petitioner never intended to sell, and had no right to sell, and did not sell, the moving pictures or reels in question to the bankrupt.

(9) That the petitioner is the owner of the motion picture films or reels described in its petition herein, and is entitled to immediate possession thereof.

Wherefore, by reason of the law on the facts aforesaid, it is ordered, adjudged, and decreed that the petitioner, the said Lubin Manufacturing Company, is the owner of the property sought to be reclaimed, to wit, the 29 motion pictures or reels, and is entitled to the immediate possession thereof; and that the said trustee has no interest or claim therein and no title thereto, of any kind or nature.

It is further ordered, adjudged, and decreed that the said Charles H. McClure, trustee, be and is hereby enjoined and restrained from in any manner claiming or asserting any claim that the said Kay-Tee Film Exchange, a corporation, bankrupt, or that said trustee has any right, title, or interest in and to said property, as trustee of the estate of said bankrupt; that the said trustee of estate shall deliver to the said Lubin Manufacturing Company, petitioner, or to its attorney, the said motion pictures or reels, described in said petition as follows: The Little Violinist; The Little Stick Gatherers; Blasting Furnace (tinted); Which Was the Happiest Time in your Life; Love Germs; Aunty Emma's Scrap Book; Blind Musician; Willie's Water Sprinkler, No. 5,874; Bank Messenger; A Silver Dollar; Unlucky Horseshoe; A Broken Heart; The Pass Key; Love Me, Love My Dog; A Game of Chess; The New Governess; A Dime Novel Detective; The Last Call; I'll Only Marry a Sport; The Stowaway; The New Mirror; Little Rag Doll; Talked to Death; Cowboy's Argument; Reforming a Husband; A Secret; A Trip Through Barnes; Uncle Reuben's Courtship; The Day of the Dog; Our Ice Supply; A Just Reward; Mad Dog; Two Gentlemen of the Road; The Spanish Wife; Daughter's Choice; The Right House, but—; Jones' Watch; Hemlock Hoax; Fisherman's Luck; Western Justice; When the Cat's Away; Angel of Dawson's Claim; Master Mechanic; Mrs. Nosey.

T. F. McDonald (G. E. Waldo, on the **brief**), for petitioner.
Hanson, Hackler & Heath, for trustee.

WELLBORN, District Judge. This matter having heretofore been submitted to the court for its consideration and decision on a review of the referee's order allowing petition of Lubin Manufacturing Company for reclamation of 29 rolls of moving pictures in the possession of the trustee of the estate of said bankrupt, now, the court having duly considered the same, and being fully advised in the premises, it is ordered that the order of the referee herein be, and the same hereby is, affirmed.